CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

JEREMY N. HENDON (ORBN 982490)
AMY MATCHISON (CABN 217022)
Trial Attorneys
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:     (202) 353-2466
                    (202) 307-6422
Fax:            (202) 307-0054
E-mail: Jeremy.Hendon@usdoj.gov
          Amy.T.Matchison@usdoj.gov
          Western.Taxcivil@usdoj.gov

BRIAN J. STRETCH (CABN 163973)
United States Attorney
THOMAS MOORE (ALBN 4305-O78T)
Chief, Tax Division
COLIN C. SAMPSON (CABN 249784)
Assistant United States Attorney
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
Telephone: (415) 436-7020
Email:  Colin.Sampson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF: | )<br>)<br>) Civil Number: |
| JOHN DOES, United States persons who, at any time during the period January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21. | )<br>)<br>) **UNITED STATES' MEMORANDUM IN**<br>) **SUPPORT OF *EX PARTE* PETITION**<br>) **FOR LEAVE TO SERVE JOHN DOE**<br>) **SUMMONS**<br>)<br>) |

     The United States of America submits this memorandum in support of its petition for an order

approving the service of an Internal Revenue Service "John Doe" summons on Coinbase, Inc. for

information related to transactions conducted in convertible virtual currency as defined in IRS Notice

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons            1

2014-21.  Pursuant to 26 U.S.C. § 7609(h)(2), the Court's determination to approve a John Doe

summons shall be made *ex parte* and shall be made solely on the petition and supporting affidavits.

Thus, the pleadings filed in this proceeding will not be served upon any person or entity and no other

filings are permitted from other persons or entities.  Accordingly, this matter is ripe for the Court's

consideration.  The United States requests that the Court review the petition and supporting documents

and enter the proposed order at the Court's earliest opportunity.

## INTRODUCTION

The IRS is responsible for monitoring ways in which United States taxpayers evade their United

States tax obligations by concealing or otherwise failing to report their proper amount of taxable income

and thus underpay their taxes.  The ever-changing digital age and innovation pose new risks for the IRS

and tax compliance by United States taxpayers.  One such innovation is the creation of virtual currency

which, unlike U.S. dollars or other government-issued currencies, does not have a physical coin or bill

associated with their circulation and is not owned by any government.

Since 2009, the use of virtual currency has increased exponentially.  Some users value the

relatively high degree of anonymity associated with virtual currency transactions because only a

transaction in virtual currency, such as buying goods or services, is public and not the identities of the

parties to the transaction.  Because of that, virtual currency transactions are subject to fewer third-party

reporting requirements than transactions in conventional forms of payment.  However, due to this

anonymity and lack of third-party reporting, the IRS is concerned that U.S. taxpayers are underreporting

taxable income from transactions in virtual currencies.  Further, because the IRS considers virtual

currencies to be property, United States taxpayers can realize a taxable gain from buying, selling, or

trading in virtual currencies.  There is a likelihood that United States taxpayers are failing to properly

determine and report any taxable gain from such transactions.

In order to identify taxpayers who have may have underpaid taxes associated with transactions in

virtual currency, the United States brings this ex parte proceeding under § 7609(f) and (h) of the Internal

Revenue Code (26 U.S.C.) for leave to serve a John Doe summons on Coinbase.  The John Doe

summons seeks records relating to transactions in convertible virtual currency as defined in IRS Notice

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons          2

2014-21.  *See* Declaration of Senior Revenue Agent Davide Utzke in Support of *Ex Parte* Petition for Leave to Serve "John Doe" Summons ("Utzke Decl.") Exhibit B.  The John Does whose identities are sought by the summons are United States persons who, at any time during the period January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency.  The issuance of the summons is warranted here because (i) the summons relates to an ascertainable group or class of persons; (ii) there is a reasonable basis for believing these U.S. taxpayers failed to comply with internal revenue laws; and (iii) information sufficient to establish these U.S. taxpayers' identities is not readily available to the IRS from other sources.

## BACKGROUND

### A.      What virtual currency is and how it works

Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  Utzke Decl. ¶ 7.  In some situations, virtual currency operates like "traditional currency," i.e., the coin and paper money of a country that is designated as legal tender.  However, it does not have legal tender status in any jurisdiction.  *Id*.  A virtual currency is considered "convertible" if it has an equivalent value in traditional currency or acts as a substitute for traditional currency.  Convertible virtual currency can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other traditional or virtual currencies.  *Id*.

In order to transact in a virtual currency system, a user would need to create a "wallet."  A wallet is a digital computer file that contains information necessary to send and receive units of a virtual currency.  *Id.* at ¶ 8.  When the wallet is created, a random wallet address is generated; this is a unique alphanumeric identifier, which is conceptually similar to an e-mail address.  *Id*.

A wallet holds any number of public keys and their associated private keys.  The public key and private key are conceptually similar to a user ID and a digital signature, respectively.  In order to exchange units of a virtual currency, a virtual currency user needs to electronically send their public key to anyone with whom they want to transact.  *Id.* at ¶ 9.  The public key contains information that verifies the wallet and the private key is used to authenticate a transaction.  Only once the transaction is signed by both parties, is the transaction complete.  A completed transaction is then introduced to a network of

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons          3

computers monitored by competing groups of people called miners.  After computers on the network confirm that a transaction is authentic, the transaction is posted to a "block" – a grouping of transactions. When a specified number of confirmed transactions have been grouped, a block is formed.  *Id.* at ¶ 11. Miners then compete against each other to find a solution to a mathematical puzzle that depends on the contents of the block; once a solution is found, that block will be added to the blockchain.

Miners maintain the integrity of the blockchain:  a sequential public list of all transactions. Miners also validate transactions that go into the blockchain with the motive of earning virtual currency. *Id.*  When a new block is added to the blockchain, new virtual currency coins are generated and awarded to the miner who discovered the mathematical puzzle solution that allows the new block to be added to the blockchain.  The cycle then repeats.  *Id.*

All transactions in a virtual currency blockchain can be viewed by the public on any computer connected to the Internet.  However, the blockchain transactional history only reveals the date, the time, the amount (denominated in virtual currency), and the wallet addresses associated with a transaction. The blockchain does not identify the actual identities of the wallet owners.  *Id.* at ¶ 12.

There are nearly a thousand virtual currencies, but the most widely known virtual currency, and largest by capitalization, is bitcoin.  Other virtual currencies mimicking bitcoin using the blockchain technology are known as alternative coins or altcoins for short.  Just a few examples of altcoins are Ethereum, Litecoin, Ripple, Feathercoin, and Dogecoin.  *Id.* at ¶ 13.

**B.      How virtual currency can be obtained and used**

In order to buy virtual currency with a medium of exchange denominated in a traditional currency, such as a conventional check, credit card, wire, or Automated Clearing House (ACH) electronic payment, a virtual currency user will have to find some way to transfer traditional currency to someone who already has virtual currency and wishes to exchange it for traditional currency.  *Id.* at ¶ 14. In theory, this could be anyone with a virtual currency; in practice, this tends to be managed by businesses called virtual currency exchangers that trade between virtual currencies and traditional currencies.  *Id.*

A virtual currency exchanger functions much like an exchanger for traditional currency except it can exchange virtual currency for traditional currency or vice versa.  Because virtual currency exchangers may receive conventional checks, credit card, debit card, or wire transfer payments in exchange for virtual currency, they are a link between virtual currency systems and conventional banking and money-transmittal systems.  *Id.* at ¶ 15.

A virtual currency exchanger may operate on one or more virtual currency platforms.  The exchange rate between traditional currency and virtual currency, and between different virtual currency systems, is typically set by supply and demand, and different exchangers compete for business.  Because mechanisms exist for exchanging virtual currencies and traditional currencies, virtual currencies have spread beyond online transfers between consumers; they are now used for purchases from brick-and-mortar businesses as well as online merchants.  *Id.* at ¶ 16.

Virtual currency exchangers may also provide wallet services, which allow a user to quickly authorize virtual currency transactions with another user through the use of a traditional money account held at the exchanger, similar to a margin account held with a stock broker.  Wallet accounts are easily accessed through a computer or mobile device like a smartphone.  *Id.* at ¶ 17.

**C.      How Coinbase operates in the virtual currency world**

Coinbase is a virtual currency exchanger headquartered in San Francisco, California.  It offers buy/sell trading functionality in 32 countries, maintains over 4.9 million wallets with wallet services available in 190 countries, 3.2 million customers served, and $2.5 billion exchanged in bitcoin. *Id.* at ¶ 39.  As of December 2015, Coinbase was the fourth largest exchanger globally of bitcoin into U.S. dollars and the largest exchanger in the United States of bitcoin into U.S. dollars.  Coinbase started business in June 2012 as a digital wallet service.  By October 2012, the company launched the ability to buy and sell bitcoin through bank transfers.  *Id.*  By 2014, Coinbase had grown to one million users and had formed partnerships with Overstock, Dell, Expedia, Dish Network, Time Inc., and Wikipedia and assisted Stripe, Braintree, and PayPal in accepting bitcoin payments.  *Id.* at ¶ 40.

As of December 2015, Coinbase has four main products: (1) an exchange for trading bitcoin and fiat currency (fiat currency is legal tender that is backed by the government that issued it); (2) a wallet

1   for bitcoin storage and transactions; (3) an application programming interface (API) for developers and

2   merchants to build applications and accept bitcoin payments; and (4) "Shift Card," the first U.S.-issued

3   bitcoin debit card.  *Id.* at ¶ 42.  The Shift Card is a VISA branded debit card that enables Coinbase users

4   in the United States (that reside in one of twenty-four states and Washington, D.C.) to spend bitcoin

5   anywhere VISA is accepted.  *Id.*

6   **D.       The IRS's investigation into the use of virtual currency**

7   In 2013, at the request of the Senate Finance Committee, the Government Accountability Office

8   ("GAO") issued a report regarding tax compliance issues relating to virtual currencies.  *See* U.S. Gov't

9   Accountability Office Report GAO-13-516, *Virtual Economies and Currencies: Additional IRS*

10   *Guidance Could Reduce Tax Compliance Risk,* http://www.gao.gov/products/GAO-13-516.  Through

11   interviews with industry representatives, tax professionals, IRS officials and academics, the GAO report

12   identified several tax compliance risks associated with virtual currencies, including lack of third-party

13   reporting, lack of knowledge among taxpayers, and uncertainty over the characterization of gains

14   realized from virtual currencies.  *Id.* at 14.  The report found that "some taxpayers may use virtual

15   economies and currencies as a way to evade taxes.  Because transactions can be difficult to trace and

16   many virtual economies and currencies offer some level of anonymity, taxpayers may use them to hide

17   taxable income."  *Id.*  The report recommended that the IRS promulgate additional guidance tax

18   regarding convertible virtual currencies.  *Id.* at 17.

19   In response to this report, in March 2014, the IRS issued Notice 2014-21, which describes how

20   the IRS applies U.S. tax laws and general tax principles to transactions involving virtual currency.  *See*

21   Notice 2014-21 (Utzke Decl. Exhibit A).  In Notice 2014-21, the IRS stated its position that virtual

22   currencies that can be converted into traditional currency are property for tax purposes, and a taxpayer

23   can have a gain or loss on the sale or exchange of a virtual currency, depending on the taxpayer's cost to

24   purchase the virtual currency (that is, the taxpayer's tax basis).

In May 2014, the GAO issued a second report that focused more broadly on the public policy challenges posed by the use of virtual currencies.  The report found that due in part to "the higher degree of anonymity" offered by virtual currencies, they "may be attractive to parties seeking to . . . move or conceal money obtained by illegal means."  *See* U.S. Gov't Accountability Office Report GAO-14-496, *Virtual Currencies' Emerging Regulatory, Law Enforcement, and Consumer Protection Challenges,* http://www.gao.gov/products/GAO-14-496; *see also* Omri Marian, *Are Cryptocurrencies Super Tax Havens?*, 112 Mich. L. Rev. First Impressions 38 (2013) (concluding that virtual currencies share the characteristics of tax havens because earning are not subject to taxation, taxpayer anonymity is maintained, and their operation is not dependent upon financial institutions); Nicholas Godlove, *Regulatory Overview of Virtual Currency*, 10 Okla. J. L. & Tech. 71 (2014) (identifying an advantage of virtual currency as ease of use in illegal or sensitive transactions, including money laundering and tax evasion); *Virtual Currency:  Hearing Before the Committee on Banking, Housing, and Urban Affairs, Subcommittee on National Security and International Trade and Finance with Subcommittee on Economic Policy,* 113th Cong. (2013) (statement of Jennifer Shasky Calvery, Director Financial Crimes Enforcement Network, United States Department of the Treasury) (virtual currency has the potential to be exploited for money laundering because of its anonymity, accessibility, and regulatory challenges); *Money Laundering in Digital Currencies,* United States Department of Justice National Drug Intelligence Center, Product No. 2008-R0709-003 (June 2008) (virtual currencies provide an ideal money laundering instrument because they facilitate payments without the concern for documentation, identification, or law enforcement suspicion).  Recently, the Treasury Inspector General for Tax Administration issued a report on the increased use of virtual currencies and the associated risks of reporting noncompliance in taxable transactions.  Treasury Inspector General for Tax Administration Reference Number: 2016-30-083, *As the Use of Virtual Currencies in Taxable Transactions Become*

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons          7

*More Common, Additional Actions Are Needed to Ensure Taxpayer Compliance* (September 21, 2016)

https://www.treasury.gov/tigta/auditreports/2016reports/201630083fr.pdf.

The IRS has continued to gather information regarding the tax compliance issues posed by the use of virtual currency. Senior Revenue Agent Utzke identified and interviewed three taxpayers who had used virtual currencies as a means of evading taxes. Utzke Decl. ¶¶ 30, 34. Two of these taxpayers were corporate entities with annual revenues of several million dollars that bought and sold bitcoins. *Id.* at ¶ 34. Both entities had wallet accounts at Coinbase and attempted to conceal bitcoin transactions as technology expenses on their tax returns. *Id.* The third taxpayer diverted his income to an offshore tax haven and used virtual currency to repatriate his assets without government detection. *Id.* at ¶ 31. In addition to these, Senior Revenue Agent Utzke's research identified individuals prosecuted and convicted of federal crimes for anti-money laundering and/or operating an unlicensed money services business involving virtual currency transactions. *Id.* at ¶ 35. IRS records indicate that these defendants never reported to the IRS their virtual currency transactions. *Id.*

Senior Revenue Agent Utzke also identified a host of factors that increase the likelihood that the proposed summons will reveal the identities of delinquent taxpayers. These include:

- The fact that virtual currency transactions are subject to fewer third-party reporting requirements than conventional forms of payment, which in the IRS's experience, significantly increases tax underreporting (*id.* at ¶ 37);

- The relatively high degree of anonymity associated with virtual currency transactions (*id*. at ¶ 38);

- A public perception that virtual currency can be used to evade taxes, including at least one instance of open acknowledgement by bitcoin users that tax evasion is a sought-after feature of using bitcoins (*id*. at ¶ 35 *citing* "Bitcoin Celebrated As Way To Avoid Taxes," Huffington Post (April 16, 2013) *available at* www.huffingtonpost.com/2013/04/16/bitcoin-taxes_n_3093182.html (accessed November 16, 2016)); and

- Failure among virtual currency users to afford virtual currency transactions the proper tax treatment, including the proper valuation of such transactions (*id.* at ¶ 29).

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons          8

To further its investigation into the identities of U.S. taxpayers who have failed to disclose tax information relating to their participation in virtual currency transactions, the IRS is seeking to issue a summons that will allow it to identify U.S. persons who have not properly reported income arising from their use of virtual currency.  The John Doe class, therefore, is as follows:

> United States persons who, at any time during the period January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21.

Utzke Decl. Exhibit B.  This summons seeks account registration records and any Know-Your-Customer due diligence performed for each account owned or controlled by a user during the stated period, the associated transaction records, account statements, and records of payments made and processed for these users.  These types of documents should reveal the identity of account holders, as well as amounts of transactions from those accounts.  As discussed below, the summons and its John Doe class are authorized and appropriate under 26 U.S.C. § 7609.

## ARGUMENT

### The Summons Meets the Requirements for an IRS "John Doe" Summons

One of the primary functions of the IRS is to review and audit tax returns submitted by U.S. taxpayers to ensure that all applicable taxes have been paid.  Accordingly, § 7601 of the Internal Revenue Code requires the Secretary of the Treasury to "cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax."  26 U.S.C. § 7601. To aid the IRS in carrying out this function, § 7602 authorizes the Secretary to summon records and testimony that may be relevant or material to an investigation.  26 U.S.C. § 7602.  Specifically, § 7602, from which the IRS derives its principal information-gathering powers, authorizes the IRS:

> [f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, [or] determining the liability of any person for any internal revenue tax . . . [t]o summon . . . any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax . . ., or any other person the Secretary may deem proper, to appear . . . and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry.

1        In passing § 7602, Congress intended "to provide the Secretary with broad latitude to adopt

2  enforcement techniques helpful in the performance of his tax collection and assessment responsibilities."

3  *United States v. Euge*, 444 U.S. 707, 715 n.9 (1980).  The Supreme Court has noted that § 7602 forms

4  the "centerpiece" of the IRS's "expansive information-gathering authority."  *United States v. Arthur*

5  *Young & Co.*, 465 U.S. 805, 816 (1984); *see United States v. Clarke*, 134 S. Ct. 2361, 2367 (2014)

6  ("And such an investigatory tool, we have recognized, is a crucial backstop in a tax system based on

7  self-reporting.").  "Under 26 U.S.C. § 7602, the IRS has wide latitude to issue a summons for

8  investigatory purposes."  *Reiserer v. United States*, 479 F.3d 1160 1166 (9th Cir. 2007) (*citing United*

9  *States v. Jose*, 131 F.3d 1325, 1327 (9th Cir. 1997) (en banc)).  "'To establish a need for judicial

10  enforcement, this showing need only be minimal . . . . [T]he statute must be read broadly in order to

11  ensure that the enforcement powers of the IRS are not unduly restricted.'"  *Jose*, 131 F.3d at 1327-28

12  (*quoting Liberty Fin. Servs. v. United States*, 778 F.2d 1390, 1392 (9th Cir. 1985)); *see also Arthur*

13  *Young*, 465 U.S. at 816 ("the very language of § 7602 reflects … a congressional policy choice *in favor*

14  *of disclosure* of all information relevant to a legitimate IRS inquiry.  In light of this explicit statement by

15  the Legislative Branch, courts should be chary in recognizing exceptions to the broad summons

16  authority of the IRS").

17        The IRS's authority to issue John Doe summonses to banks or other depositories to discover the

18  identity of individuals who may have failed to disclose all of their income was expressly recognized by

19  the Supreme Court in *United States. v. Bisceglia*, 520 U.S. 141 (1975), and later codified in § 7609(f),

20  which provides:

21            Any summons . . . which does not identify the person with respect to
               whose liability the summons is issued may be served only after a court

22            proceeding in which the Secretary establishes that –

23            (1)     the summons relates to the investigation of a particular person or
                      ascertainable group or class of persons,

24

25            (2)     there is a reasonable basis for believing that such person or group
                      or class of persons may fail or may have failed to comply with any
                      provision of any internal revenue law, and

26

27            (3)     the information sought to be obtained from the examination of the
                      records or testimony (and the identity of the person or persons with
                      respect to whose liability the summons is issued) is not readily
                      available from other sources.

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons     10

26 U.S.C. § 7609(f).  The Court's determination as to whether the IRS has met the requirements under § 7609(f) for the issuance of a John Doe summons "shall be made ex parte and shall be made solely on the petition and supporting affidavits."  26 U.S.C. § 7609(h)(2).

Here, the Court should authorize service of the summons because all three statutory prerequisites have been met.  First, the summons relates to the investigation of an ascertainable group or class of persons, namely U.S. taxpayers who have conducted transactions in convertible virtual currency.  Second, there is a reasonable basis for believing that U.S. persons who conducted such transactions may have failed to report income to the IRS, thereby violating one or more provisions of the internal revenue laws.  Third, the information sought is not readily available to the IRS from other sources.

A.      The IRS investigation concerns an ascertainable class

The summons here clearly relates to an investigation of an ascertainable group of people, which the summons defines as "United States persons who, at any time during the period January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21."  Utzke Decl. Ex. B.  In other words, the summons relates to the IRS's investigation of U.S. taxpayers who transacted in virtual currency between 2013 through 2015.  This is sufficient to establish that the summons relates to an ascertainable group of persons.

Although neither the statute nor the case law further define the term "ascertainable group or class of persons" as it is used in § 7607(f), cases have endorsed the service of John Doe summonses seeking information on a group of people defined in a similar manner (*i.e.*, by the type of transaction they engaged in and the date of the transaction.  *See, e.g.*:

- *In re Tax Liabilities of John Does, United States Taxpayers Who, at Any Time During the Years Ended December 31, 2004 Through December 31, 2012, Directly or Indirectly Had Interests In or Signature or Other Authority With Respect to Any Financial Accounts Maintained At, Monitored By, Or Managed Through CIBC FirstCaribbean International Bank Limited (Collectively FCIB) or Other Financial Institutions FCIB Permitted To*

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons          11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

*Transact Client Business Through its United States Correspondent Account at Wells Fargo Bank, N.A.*, Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons, Docket No. 6, Case No. 13-CV-1938 (TEH) (N.D. Cal. Apr. 29, 2013) (holding that IRS investigation related to ascertainable group of people for "John Doe" summons to Wells Fargo Bank, N.A. seeking documents establishing the identity of U.S. taxpayers for the years ended December 31, 2004 through December 31, 2012, who had interests in or signature or other authority with respect to financial accounts that FCIB permitted to transact business through its correspondent account at Wells Fargo Bank, N.A. (a copy of this Order is attached herewith);

- *In re Tax Liabilities of John Does Who from December 31, 2002 through December 21, 2010 had Interests in Financial Accounts Managed through HSBC India*, Order Granting *Ex Parte* Petition for Leave to Serve "John Doe" Summons, Docket No. 10, Case No. 11-CV-1686 (LB) (N.D. Cal. Apr. 7, 2011) (holding that IRS investigation related to an ascertainable group of people for "John Doe" summons on HSBC Bank USA, N.A. seeking documents establishing the identity of U.S. taxpayers "who at any time during the years ended December 31, 2002 through December 31, 2010, directly or indirectly had interests in or signature or other authority … with respect to any financial accounts maintained at, monitored by, or managed through [HSBC India]")(a copy of this Order is attached herewith);

- *In re Tax Liabilities of John Does Who from January 1, 2005 through December 31, 2010, Transferred Real Property in the State of California*, 2011 WL 6302284, at *2, Case No. 2:10-mc-00130 (E.D. Cal. Dec. 15, 2011) (holding that IRS investigation related to an ascertainable group of people where the summons "squarely particularize[d] the individuals sought from the general public" by identifying the class as California

1    residents who between 2005 and 2010 were involved in certain real property transfers for

2        little or no consideration);

3    • *In re Tax Liabilities of John Does*, 2003 WL 22953182, at * 1, Case No. 03-22793-CIV

4        (S.D. Fla. Oct. 30, 2003) (holding that IRS investigation related to an ascertainable group

5        of people where summons identified class as U.S. taxpayers who between 1997 and 2003

6        sold credit insurance policies where the policies were reinsured with entities in the Turks

7        and Caicos Islands).

8

9    Here, similarly, the IRS has established that the investigation underlying the summons relates to an

10   "ascertainable group or class of persons."  26 U.S.C. § 7609(f).

11           **B.    There is a reasonable basis to believe that the unknown persons may fail, or may**
12                   **have failed, to comply with the internal revenue laws**

13       The IRS has a reasonable basis to believe that the unknown individuals who comprise the group

14   of persons set forth in the summons failed or may have failed to comply with provisions of the internal

15   revenue laws.  When enacting § 7609(f), Congress did "not intend to impose an undue burden on the

16   [IRS] in connection with obtaining a court authorization to serve this type of summons."  H. Rep. No.

17   940658, 94th Cong., 1st Sess., at 311.  Accordingly, to meet the "reasonable basis" prong, the IRS need

18   only show that a transaction has occurred that is "of such a nature as to be reasonably suggestive of the

19   possibility that the correct tax liability with respect to that transaction may not have been reported."  *Id.*

20   Courts, therefore, have interpreted this requirement narrowly as intended only "to prevent the Service

21   from exercising its summons power in an arbitrary or quixotic manner."  *In re Tax Liabilities of John*

22   *Does, Members of the Columbus Trade Exchange in the Years 1977 and 1978*, 671 F.2d 977, 980 (6th

23   Cir. 1982) (authorizing John Doe summons to barter exchange organization seeking identities of barter

24   transaction participants for two tax years).

25       Here, based on the IRS's experience, U.S. taxpayers have made use of virtual currencies to evade

26   the reporting and payment of taxes.  *See* Utzke Decl. at ¶¶ 30, 34.  As described above, Senior Revenue

27   Agent Utzke is aware of three instances of U.S. taxpayers using virtual currency transactions to conceal

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons        13

1 │ income, two involve Coinbase. *Id.* There have also been criminal proceedings in the United States in

2 │ which the defendants were proved or alleged to have used virtual currencies for money laundering

3 │ and/or the operation of an unlicensed money services business. *Id.* at ¶ 35. IRS records indicate that

4 │ these defendants never reported to the IRS their virtual currency transactions. *Id.; see, e.g.,* Sarah

5 │ Gruber, *Trust, Identity, and Disclosure: Are Bitcoin Exchanges the Next Virtual Havens for Money*

6 │ *Laundering and Tax Evasion*, 32 Quinnipiac L. Rev. 135 (2013) ("money laundering naturally pairs well

7 │ with shirking one's tax responsibility"). Finally, there are additional factors indicating the likely

8 │ incidence of tax delinquency involving virtual currency, including a lack of third-party information

9 │ reporting; relative anonymity of the transactions; a public perception that tax evasion is possible with

10 │ virtual currency; and a failure among virtual currency users to afford virtual currency transactions the

11 │ proper tax treatment, including the proper valuation of such transactions. *Id.* at ¶ 29. These facts,

12 │ coupled with the IRS's experience (*Id.* at ¶¶ 30, 34, 35) with other modes of payment not accompanied

13 │ by third-party reporting, show that U.S. taxpayers utilizing Coinbase may have failed to report income

14 │ and other information required under the internal revenue laws.

15 │ 　　　　This information is sufficient to establish that the IRS has a reasonable basis for issuing the

16 │ summons. *See, e.g., United States v. Kersting*, 891 F.2d 1407 (9th Cir. 1989) ("John Doe" summons

17 │ enforced after district court found "the existence of at least one case in which a Tax Court found some of

18 │ Kersting's programs to be abusive of the tax code." 891 F.2d at 1409. The Ninth Circuit affirmed:

19 │ "There was ample basis for believing that the persons about whom records were sought had not

20 │ complied with the tax law." 891 F.2d at 1412); *United States v. Pittsburgh Trade Exchange, Inc.*, 644

21 │ F.2d 302, 306 (3d Cir. 1981) (IRS agent's testimony that transactions of the type the summoned party

22 │ arranged for its clients were "inherently susceptible … to tax error" sufficient to meet "reasonable basis"

23 │ prong); *United States v. Ritchie*, 15 F. 3d 592, 601 (6th Cir. 1994) (clients' payment for legal services

24 │ with large amounts of cash provided a reasonable basis to issue a "John Doe" summons). Here, as

25 │ Senior Revenue Agent Utzke's Declaration demonstrates, the IRS not only has a suspicion that the John

26 │ Doe class includes U.S. taxpayers who are not complying with the law—it knows that the class in the

27 │ past included such violators, and very likely includes others.

Memorandum In Support of *Ex Parte* Petition
For Leave to Serve John Doe Summons          14

**C.      The information sought about the John Doe class is not readily available from other sources**

Finally, the information the IRS seeks through the summons is not readily available from any other sources.  The only entities possessing information relating to virtual currency transactions that identify the persons involved in the transactions, and hold material relating to the transactions, are the exchangers and any intermediaries.  Therefore, it is logical to summon a party known to have some role in the transaction, here Coinbase.  *See also Matter of Oil & Gas Producers Having Processing Agreements with Kerr-McGee Corp.*, 500 F. Supp. 440, 442 (W.D. Okla. 1980) (information may have been available from other sources, however it was more readily available from the centrally located summoned party and thus § 7609(f) element is satisfied).

In circumstances analogous to the present context, courts have recognized that the identities of U.S. taxpayers were not readily available except from financial entities that possessed records regarding suspicious transactions.  *See, e.g., In re Tax Liabilities of John Does Who During the Years Ended December 31, 1998 and 1999, Had Signatory Authority Over American Express or Master Card Credit, Charge or Debit Cards*, Case No. 00-cv-3919 (S.D. Fla. Oct. 30, 2000) (identity of taxpayers not readily available except from American Express and MasterCard International, Inc., who possessed credit card information for cards issued by offshore banks) (a copy of this Order is attached herewith); *Pittsburgh Trade Exchange, Inc.*, 644 F.2d at 306 (identities of taxpayers who engaged in suspicious barter transactions could not be obtained except from organizing body of barter exchange).

*      *      *

1

**CONCLUSION**

2    The United States has met the requirements of 26 U.S.C. § 7609(f) in order to be allowed to

3  serve its John Doe summons on Coinbase, Inc.  Accordingly, the United States' Petition should be

4  granted.

5        Dated this 17th day of November, 2016.

6                                                    CAROLINE D. CIRAOLO
                                                     Principal Deputy Assistant Attorney General
7

8                                                    /s/ Jeremy N. Hendon
                                                     /s/ Amy Matchison
9                                                    JEREMY N. HENDON
                                                     AMY MATCHISON
10                                                   Trial Attorneys, Tax Division
                                                     U.S. Department of Justice
11

12                                                   BRIAN J. STRETCH
                                                     United States Attorney
13                                                   Northern District of California

14                                                   /s/ Colin C. Sampson
                                                     COLIN C. SAMPSON
15                                                   Assistant United States Attorney,
                                                     Tax Division
16

17

18

19

20

21

22

23

24

25

26

27