CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General

JEREMY N. HENDON (ORBN 982490)
AMY MATCHISON (CABN 217022)
Trial Attorneys
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:   (202) 353-2466
             (202) 307-6422
Fax:         (202) 307-0054
E-mail: Jeremy.Hendon@usdoj.gov
        Amy.T.Matchison@usdoj.gov
        Western.Taxcivil@usdoj.gov

BRIAN J. STRETCH (CABN 163973)
United States Attorney
THOMAS MOORE (ALBN 4305-O78T)
Chief, Tax Division
COLIN C. SAMPSON (CABN 249784)
Assistant United States Attorney
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
Telephone: (415) 436-7020
Email: Colin.Sampson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE TAX LIABILITIES OF:<br><br>JOHN DOES, United States persons who, at any time during the period January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21. | Civil Number:<br><br>**DECLARATION OF SENIOR REVENUE AGENT DAVID UTZKE IN SUPPORT OF *EX PARTE* PETITION FOR LEAVE TO SERVE "JOHN DOE" SUMMONS** |

I, David Utzke, pursuant to 28 U.S.C. § 1746, declare and state:

1.  I am employed as a duly commissioned Senior Revenue Agent by the Internal Revenue Service and am assigned to the IRS's Offshore Compliance Initiatives (OCI) program. I am assigned to

work on virtual currency issues. The OCI program develops projects, methodologies, and techniques for identifying United States taxpayers who are involved in abusive offshore transactions and financial arrangements for tax-avoidance purposes. Although this program typically involves abusive offshore transactions and financial arrangements, the virtual currency issues I have been working on are not limited to offshore activities.

2. I have been an Internal Revenue Agent since January 2008. From approximately October 2009 until April 2012, I worked as an International Individual Compliance field agent specializing in offshore investigations. After that, for approximately one and a half years, I was assigned as a Technical Specialist on the Jurisdiction-to-Tax and U.S. Investment Activities IRS International Practice Network where I worked on the emerging issue of virtual currencies. In October 2013, I was assigned to work in the IRS OCI program. I am currently assigned to investigate tax non-compliance connected with the use of virtual currencies.

3. I graduated from the Federal Law Enforcement Training Center's advanced course of Economic Crimes Investigation and Analysis. I also hold a certificate of training in Open Source Intelligence research, which includes both surface web and deep web investigations. My academic credentials include a doctorate with relevant study in International Finance and Economics and a master's in Forensic Accounting and International Finance. I am a Certified Fraud Examiner and Certified Forensic Interviewer. My continuing professional education training each year focuses on tracking hidden offshore assets. I am an occasional lecturer at the Thomas Jefferson School of Law in San Diego, California, on the topic of virtual currencies. In addition, I develop and deliver training within the IRS on the topic of virtual currencies.

I.  **BACKGROUND REGARDING VIRTUAL CURRENCIES**

4. In 2013, at the request of the Senate Finance Committee, the Government Accountability Office (GAO) completed a study of the use of virtual currency within virtual economies (such as on-line role playing games) and outside of virtual economies. Through interviews with industry representatives, tax professionals, IRS officials and academics, GAO identified several tax compliance risks associated with virtual currencies, ranging from lack of knowledge of tax requirements and uncertainty over how to

report virtual currency transactions, to deliberate underreporting of income and tax evasion. *See* U.S. Gov't Accountability Office, GAO-13-516, <u>Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks</u> (2013).

5. As the organization responsible for enforcing and administering the tax laws of the United States, the IRS has determined that transactions in a virtual currency that is convertible into real currency have tax consequences that may result in a tax liability.

6. In March 2014, the IRS issued Notice 2014-21, which describes how the IRS applies U.S. tax principles to transactions involving virtual currency. A copy of Notice 2014-21 is attached as Exhibit A. In Notice 2014-21, the IRS stated its position: virtual currencies that can be converted into traditional currency are property for tax purposes, and a taxpayer can have a gain or loss on the sale or exchange of a virtual currency, depending on the taxpayer's cost to purchase the virtual currency (that is, the taxpayer's tax basis).

**A. How virtual currency works**

7. Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and a store of value. In some situations, virtual currency operates like "traditional currency," *i.e.*, the coin and paper money of a country that is designated as legal tender. However, it does not have legal tender status in any jurisdiction. A virtual currency is "convertible" if it has an equivalent value in traditional currency or acts as a substitute for traditional currency. Convertible virtual currency can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other traditional or virtual currencies.

8. In a virtual currency system, a user creates a "wallet." A wallet is a digital computer file that contains information used in sending and receiving units of a virtual currency. When the wallet is created, a random wallet address is generated; this is a unique alphanumeric identifier, which is conceptually similar to an e-mail address. Basic wallets can be created free of charge.

9. A wallet holds any number of public keys with their associated private keys. The public key and private key are conceptually similar to a user ID and a digital signature, respectively. A virtual currency user will electronically send their public key to anyone with whom he or she wants to exchange

units of a virtual currency. The public key contains information that verifies the wallet and the private key used to authenticate a transaction. If the transaction is signed by both parties, the transaction is complete.

10. A completed transaction is then introduced to a network of computers monitored by competing groups of people called miners. Miners maintain the integrity of a sequential public list of all transactions called the blockchain; miners also validate transactions that go into the blockchain with the motive of earning virtual currency.

11. After computers on the network confirm that a transaction is authentic, the transaction is posted to a "block" – a grouping of transactions. When a specified number of confirmed transactions have been grouped, a block is formed. Miners then compete against each other to find a solution to a mathematical puzzle that depends on the contents of the block; once a solution is found, that block will be added to the blockchain. When a new block is added to the blockchain, new virtual currency coins are generated and awarded to the miner who discovered the mathematical puzzle solution that allows the new block to be added to the blockchain. The cycle then repeats.

12. All transactions in a virtual currency blockchain can be viewed by the public on any computer connected to the Internet. However, the blockchain transactional history only reveals the date, the time, the amount (denominated in virtual currency), and the wallet addresses associated with a transaction. The blockchain does not identify the actual identities of the wallet owners.

13. There are nearly a thousand virtual currencies, but the most widely known virtual currency, and largest by capitalization, is bitcoin. Other virtual currencies mimicking bitcoin using the blockchain technology are known as alternative coins or altcoins for short. Just a few examples of altcoins are Ethereum, Litecoin, Ripple, Feathercoin, and Dogecoin.

**B. How virtual currency can be obtained and utilized**

14. In order to buy virtual currency with a medium of exchange denominated in a traditional currency, such as a conventional check, credit card, wire, Automated Clearing House (ACH) electronic payments, the virtual currency user will have to find some way to transfer traditional currency to someone who already has virtual currency and wishes to exchange it for traditional currency. This

exchange can occur with anyone holding a virtual currency, but tends to be handled through businesses called virtual currency exchangers that trade between virtual currencies and traditional currencies.

15. A virtual currency exchanger functions much like an exchanger for traditional currency except it can exchange virtual currency for traditional currency or vice versa. Because virtual currency exchangers may receive conventional checks, credit card, debit card, or wire transfer payments in exchange for virtual currency, they are a link between virtual currency systems and conventional banking and money-transmittal systems.

16. A virtual currency exchanger may operate on one or more virtual currency platforms. The exchange rate between traditional currency and virtual currency, and between different virtual currency systems, is typically set by supply and demand, and different exchangers compete for business. Because mechanisms exist for exchanging virtual currencies and traditional currencies, virtual currencies have spread beyond online transfers between consumers; they are now used for purchases from brick-and-mortar businesses as well as online merchants.

17. Virtual currency exchangers may also provide wallet services, which allow a user to quickly authorize virtual currency transactions with another user through the use of a traditional money account held at the exchanger similar to a margin account held with a stock broker. Wallet accounts are easily accessed through a computer or mobile device like a smartphone. A wallet can be held in a number of different ways, but millions of users have a wallet provided by an exchanger.

18. Some virtual currency exchangers are registered with the U.S. Treasury Department Financial Crimes Enforcement Network (FinCEN) as Money Services Businesses. Registration carries with it the requirement of following Anti-Money Laundering (AML) rules, including Know Your Customer (KYC) rules. KYC principles require a registered exchanger to confirm and document the identities of its customers and to relate each account to a known beneficial owner.

19. The graph below illustrates some of the ways in which individuals can obtain and spend bitcoins.



Source: GAO.

U.S. Gov't Accountability Office, GAO-14-496, <u>Virtual Currencies' Emerging Regulatory, Law Enforcement, and Consumer Protection Challenges</u> (2014), p. 8.

**C.     Tax compliance concerns associated with the use of virtual currencies**

20. The primary virtual currency receiving attention regarding taxable transactions and tax compliance is bitcoin because it is the most traded virtual currency and the largest by capitalization. Bitcoin is a virtual currency that exists only on the Internet, does not have legal tender status (in contrast to U.S. dollars or Euros), and has its own value units.

21. Money is generally defined as having the functions of being a medium of exchange, a unit of account, and a store of value. Bitcoin acts as a medium of exchange, as evidenced by the existence of a marketplace for goods and services that can be purchased with it. Bitcoin is a unit of

account - a unit of measure used to value goods, services, assets, liabilities, income, and expenses. Bitcoin is also a store of value since it can be stored, retrieved, and exchanged for goods and/or services at a later date. However, as previously noted it is not legal tender in any jurisdiction and is not treated as currency for tax purposes.

22. Bitcoin derives its value from its usefulness as a form of money that allows for pseudo-anonymous, peer-to-peer transactions with the economic function of money (i.e., medium of exchange, a unit of account, and/or a store of value) as stated above.

23. The value of bitcoin against the U.S. dollar, as with many other world currencies, is determined by supply and demand on the open market and affected by factors that are typically difficult or impossible to forecast, such as an increase in investment into bitcoin financial technology startups, security breaches, geopolitical regulatory issues, and bitcoin exchange collapses. In the simplest concept of supply and demand, when demand for bitcoins increases, the price increases and when demand falls, the price falls.

24. As adoption of bitcoin as a store of value has grown, there is a growing trend of some U.S. businesses making and accepting payments in virtual currency. Some reasons for this include the ease, low cost, and purported anonymity of bitcoin transactions.

25. There are many companies in the U.S. with international employees who are now paying wages in bitcoin; doing so can reduce payroll costs by eliminating international wire fees and can increase the speed with which their international employees receive their pay (minutes vs. weeks).

26. Small businesses are in part attracted to bitcoin payments because there are no credit card fees and no charge-backs from customer fraud, but many of these bitcoin payments have exchangers that act as third-party intermediaries who convert the bitcoin payment to a fiat currency (fiat currency is legal tender that is backed by the government that issued it) that is then transmitted to the merchant.

27. As of January 2016, it was reported that more than 100,000 merchants globally were accepting bitcoin payments with businesses such as Overstock.com, Home Depot, DirectTV, Dell, Microsoft, Amazon, and Expedia topping the list. By Fall 2016, the number of merchants is forecast to grow to 150,000. With bitcoin, a user can buy webhosting services, cars, homes, and even pizza and

manicures. In 2015, there were 125,498 bitcoin transactions per day. Using the total bitcoins traded in 2015 and the 2015 bitcoin average price, I calculated the 2015 annualized transaction value in U.S. dollars to be $10,116,817,608.

28. Virtual currencies pose challenges for central banks, departments and ministries of finance, and financial regulators. The main regulatory challenges posed by virtual currencies are the prevention of money laundering, collection of taxes, consumer and investor protection, and the calibration of monetary policy.

29. A tax compliance challenge faced by taxpayers transacting in virtual currency is that it may be difficult for individuals receiving income from virtual currencies to determine their tax basis for calculating gains because they may have trouble determining the value of the virtual currency when they first obtained it or in maintaining documentation to determine their tax basis.

30. However, some taxpayers may deliberately use virtual currencies as a way to evade taxes. Because transactions can be difficult to trace and many virtual currencies inherently have a pseudo-anonymous aspect, taxpayers may use them to hide taxable income. This is illustrated by the actions of a taxpayer I had the opportunity to interview, Taxpayer 1, who self-disclosed his virtual currency use during his examination.

31. After using a traditional abusive offshore arrangement for approximately 5 years, Taxpayer 1 became fatigued with the effort required to manage his offshore accounts, attorneys, and applicable regulations, and discovered virtual currency while conducting internet research on the topic. Taxpayer 1 began testing the use of virtual currency and eventually abandoned the use of his offshore structure. Taxpayer 1 was able to use virtual currency to repatriate his assets without governmental detection.

32. For example, Taxpayer 1 originally worked with a foreign promoter who set up a controlled foreign shell company which diverted his income to a foreign brokerage account, then to a foreign bank account, and lastly back to Taxpayer 1 through the use of an automated teller machine (ATM). Once Taxpayer 1 abandoned the use of his offshore structure in favor of using virtual currency, the steps described above were the same until his income reached his foreign bank account. Once there,

instead of repatriating his income from an ATM in the form of cash, Taxpayer 1 diverted his income to a bank which works with a virtual currency exchanger to convert his income to virtual currency. Once converted to virtual currency, Taxpayer 1's income was placed into a virtual currency account until Taxpayer 1 used it to purchase goods and services. Taxpayer 1 failed to report this income to the IRS.

33. Below is a diagram I created to demonstrate Taxpayer 1's activities with the area to the left of the red diagonal line being the traditional offshore arrangement and the area to the right of the red line the virtual currency structure. This demonstrates how Taxpayer 1 was able to effectuate large non-cash transactions on a pseudo-anonymous basis.



34. Two additional IRS exams in which I have assisted involved Taxpayer 2 and Taxpayer 3, both corporate entities with annual revenues of several million dollars, that bought and sold bitcoins which resulted in the underreporting of income. Both taxpayers admitted disguising the amount they

spent purchasing the bitcoins as deductions for technology expenses on their tax returns. The bitcoin transactions were discovered after repeated requests for the original documentation necessary to substantiate the technology expense items claimed on the tax returns. Both taxpayers ultimately conceded that the corporate expenses were bitcoin transactions and thus not deductible. In addition, Taxpayer 2 and Taxpayer 3 each had wallet accounts at bitcoin exchange Coinbase, Inc., the virtual currency exchanger the IRS seeks to summon in this case.

35. My research has also identified individuals prosecuted and convicted of federal crimes for anti-money laundering and/or operating an unlicensed money services business involving virtual currency transactions. IRS records indicate that these defendants never reported to the IRS their virtual currency transactions.

36. In addition, some taxpayers have openly acknowledged they consider using bitcoin in order to avoid tax reporting requirements. *See Bitcoin Celebrated As Way To Avoid Taxes*, Huffington Post (April 16, 2013) (www.huffingtonpost.com/2013/04/16/bitcoin-taxes_n_3093182.html).

37. Further, in the experience of the IRS, tax noncompliance increases when there is no third-party information reporting. That is, taxpayers are less likely to report and pay taxes on income that is not independently reported to the IRS by a third party. IRS "tax gap" studies consistently show that compliance is far higher when reported income amounts are subject to information reporting by third parties. The most recent such study, conducted in April 2016 based on 2008-2010 data, concluded that the overall rate of underreporting of income that was not subject to third-party information reporting was 63 percent, compared to 7 percent for amounts subject to substantial information reporting but no withholding, and 1 percent for amounts subject to substantial information reporting and withholding. *See* Tax Gap Estimates for Tax Years 2008-2010, (April 2016) (https://www.irs.gov/PUP/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf). Because there is no third-party reporting of virtual currency transactions for tax purposes, the risk/reward ratio for a taxpayer in the virtual currency environment is extremely low, and the likelihood of underreporting is significant.

38. The characteristics of virtual currencies could also enable them to replace traditional abusive tax arrangements as the preferred method for tax evaders, because such currencies are not subject to taxation at the source (*i.e.* withholding), are largely anonymous, and, as peer-to-peer systems, do not involve traditional financial intermediaries.

**D. Coinbase, Inc.**

39. Coinbase, Inc., is a Delaware corporation that operates a bitcoin wallet and exchange business headquartered in San Francisco, California. According to its website (www.coinbase.com), the company currently offers buy/sell trading functionality in 32 countries, maintains over 4.9 million wallets with wallet services available in 190 countries, 3.2 million customers served, and $2.5 billion exchanged in bitcoin. Additional research on Coinbase shows that in the 30-day period ending December 14, 2015, Coinbase was the fourth largest exchanger globally of bitcoin into U.S. dollars and the largest exchanger in the U.S. of bitcoin into U.S. dollars. Coinbase started business in June 2012 as a digital wallet service. By October 2012, the company launched the ability to buy and sell bitcoin through bank transfers.

40. In 2014, Coinbase grew to one million users, acquired the blockchain explorer service Blockr and the web bookmarking company Kippt, secured insurance covering the value of bitcoin stored on their servers, and launched a "vault system" for secure bitcoin storage. During 2014, Coinbase also formed partnerships with Overstock, Dell, Expedia, Dish Network, Time Inc., and Wikipedia and assisted Stripe, Braintree, and PayPal in accepting bitcoin payments.

41. In January 2015, Coinbase received an additional $75 million from a number of investors including the New York Stock Exchange and a subsidiary of USAA. According to Coinbase, this was the first time any traditional financial institutions had taken direct stakes in a bitcoin enterprise. Later in January, Coinbase launched what it claimed to be the first regulated U.S.-based bitcoin exchange.

42. As of December 2015, Coinbase has four main products: (1) an exchange for trading bitcoin and fiat currency (funded through bank or wire transfers); (2) a wallet for bitcoin storage and transactions; (3) an application programming interface (API) for developers and merchants to build applications and accept bitcoin payments; and (4) "Shift Card," the first U.S.-issued bitcoin debit card.

Declaration Of R/A David Utzke
In Support of *Ex Parte* Petition
For Leave to Serve "John Doe" Summons     11

14630250.1

The Shift Card is a VISA branded debit card that enables Coinbase users in the U.S. (currently only twenty-four states and Washington, D.C.) to spend bitcoin anywhere VISA is globally accepted.

43. On April 23, 2013, Coinbase registered with FinCEN as a Money Transmitter (MSB Registration Number: 31000025767705) (Coinbase re-registered with FinCEN on December 8, 2014 (MSB Registration Number 31000057750785). As a Money Transmitter, Coinbase is required by the Bank Secrecy Act and FinCEN regulations to develop, implement, and maintain an effective anti-money laundering program that, among other things, includes a process for verifying customer identification. Coinbase's user agreement states that all U.S. users who wish to use Coinbase's USD Wallet or the Coinbase Exchange, at minimum, must:

- Establish a Coinbase Account by providing a name, authenticating an e-mail address, and accepting the Coinbase User Terms;
- Add and verify a phone number;
- Add and verify a bank account;
- Add personal details (full name, date of birth, residential address); and
- Complete identity verification by answering a few questions.
- In addition, users based in New York State conducting a bitcoin transaction in excess of $3,000 must submit a copy of an acceptable form of identification (i.e. passport, state driver's license, or state identification card).

44. Based on the information set forth above, I have reason to believe that Coinbase is in possession of records identifying customers with wallet accounts, their transactional history of exchanging dollars for bitcoin, and their use of Shift debit cards.

## II. THE "JOHN DOE" SUMMONS REQUIREMENTS HAVE BEEN MET

45. In accordance with the recommendation of GAO that the IRS plan specific compliance activities to address the tax compliance risks posed by virtual currencies, the IRS has commenced an investigation to determine the correct federal income tax liabilities, for the years ended December 31,

2013, 2014, and 2015, of United States persons who conducted transactions in a convertible virtual currency as that term is defined in IRS Notice 2014-21.

46. To facilitate this investigation, the IRS is seeking the Court's permission to serve, pursuant to sections 7602 and 7609(f) of the Internal Revenue Code (26 U.S.C.), a "John Doe" summons on Coinbase, Inc. A copy of this summons is attached as Exhibit B.

47. As described below: (1) the "John Doe" summons to Coinbase relates to the investigation of an ascertainable group or class of persons; (2) there is a reasonable basis for believing that this group or class of persons has failed or may have failed to comply with provisions of the internal revenue laws; and (3) the information and documents sought to be obtained from the examination of the records or testimony (and the identity of the persons with respect to whose tax liabilities the summons has been issued) are not readily available from sources other than Coinbase.

**A. The summons describes an ascertainable class of persons**

48. The proposed "John Doe" summons seeks information regarding United States persons who, at any time during the period January 1, 2013, through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21.

49. This class of persons is ascertainable in that the individuals in the class are particularized from the general public by their characteristics of being United States persons who transacted in a convertible virtual currency.

**B. Members of the "John Doe" class may have failed to comply with internal revenue laws**

   **1. Internal revenue laws require United States taxpayers to report and pay tax with respect to transactions in virtual currency**

50. For federal tax purposes, virtual currency is treated as property. General tax principles applicable to property transactions apply to transactions using virtual currency. *See* IRS Notice 2014-21.

51. Under general tax principles applicable to property transactions, the following virtual currency transactions are reportable in the manner indicated:

- Wage, salary, or other income paid to an employee with virtual currency, is reportable by the employee as ordinary income and subject to employment taxes paid by the employer.
- Virtual currency received by a self-employed individual in exchange for goods or services is reportable as ordinary income and is subject to self-employment tax. This would include a person who "mines" virtual currency as a trade or business.
- Virtual currency received in exchange for goods or services by a business is reportable as ordinary income.
- Gain on the exchange of virtual currency for other property is generally reportable as a capital gain if the virtual currency was held as a capital asset and as ordinary income if it is property held for sale to customers in a trade or business.
- Gain on the sale of property held as a capital asset in exchange for virtual currency is reportable as a capital gain.
- Payments made in virtual currency are subject to information reporting requirements to the same extent as payments made in real currency or instruments denominated in real currency.

52. Taxpayers who have engaged in such virtual currency transactions and have not properly reported them have failed to comply with internal revenue laws.

**2. The IRS has reason to believe that members of the "John Doe" class may have failed to comply with one or more requirements of the internal revenue laws**

53. As noted above, the experience of the IRS is that tax noncompliance increases in the absence of third-party information reporting. This experience is a reasonable basis to believe that members of the "John Doe" class may have failed to comply with the internal revenue laws of the United States because there is no third-party reporting of transactions in virtual currency for tax purposes.

54. In addition, based on my experience with several virtual currency cases, in each case the taxpayers who held virtual currency accounts have concealed the existence of their virtual currency account, virtual currency transactions, and their virtual currency income from the IRS.

55. A basic Google search for *avoid taxes with bitcoin* returns numerous results containing discussions of ways to avoid and evade paying taxes by using bitcoin or other virtual currencies:



56. In addition, as discussed in paragraphs 30-33, during my investigation, I interviewed Taxpayer 1 and learned that he had switched from using an offshore structure by which to repatriate his income and avoid detection to using a virtual currency structure to accomplish the same illegal goal. Further, as discussed in paragraph 34, I assisted in two cases involving Taxpayer 2 and Taxpayer 3, both corporate entities that disguised the amount they spent purchasing bitcoins as technology expenses which they improperly deducted on their tax returns. Both taxpayers ultimately conceded that these expenses were bitcoin transactions involving property and thus not deductible.

57. The information and experience of the IRS suggests that many unknown U.S. taxpayers engage in virtual currency transactions or structures. Because the IRS does not know the identity of the

individuals within the "John Doe" class, the IRS cannot yet examine the income tax returns filed by those U.S. taxpayers to determine whether they have properly reported any income attributable to virtual currencies.

### C. The requested materials are not readily available from other sources

58. As discussed above, although the blockchain is a public ledger of all virtual currency transactions, the blockchain does not record information that identifies the persons involved in the transaction. The only third parties possessing information relating to virtual currency transactions that identify the persons involved are their exchangers and any intermediaries to the parties to the transaction and their exchangers.

59. In light of the above, the records sought by the "John Doe" summons are not otherwise readily available to the IRS.

## III. CONCLUSION

60. Based upon the foregoing, the information sought in the "John Doe" summons to be served on Coinbase, Inc., will allow the IRS to identify United States persons who may have failed to comply with their obligation to report and pay U.S. tax on income realized in virtual currency transactions during the years ended December 31, 2013, through December 31, 2015.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 15th day of November, 2016.

DAVID UTZKE
Senior Revenue Agent
Internal Revenue Service